Thank you, Your Honor. May it please the Court, I understand that I am allocated 15 minutes. I wish to reserve 5 minutes for rebuttal, with the Court's permission. Of course, we know exactly who you are, but just for the record, would you identify yourself? I'm very sorry, Your Honor. Joseph M. Malioto, and I'm representing the appellants. Thank you. That's just for the tape. We know. Thank you very much, Your Honor. I'm the missing link, Your Honor. I would like to point out, again, this is brought under Section 16, and it's for a violation of Section 7. And the important thing about both of those is that it gives this right under Section 16 to challenge mergers to individuals, regardless of what governmental agencies do, whether the DOJ or the FDA or anyone else, specifically because there is a self-interest in it. Second, I'd like to point out that Section 7 really is an incipiency-type argument. I mean, it is may, this may happen. It's, in effect, trying to prognosticate what will happen. And we have different indicia to do that. Now, the Supreme Court, in its decisions, which, again, have not been overruled, again, were not followed by the Court below. And, again, it's this microcosm analysis that is, could happen. There's no merger, that every merger could be approved if this kind of rule is allowed to continue to exist. So, for example, in this particular case, the example that was given by the Court below was that, and this, by the way, just as background, in this case, this, again, creates the largest airline in the United States. The two largest airlines are well over 50 percent control in the United States. A major competitor has been reduced. I would like to direct the Court's attention to the excerpts of the record, especially Exhibit No. 108, that goes from the excerpt, that starts in the excerpt of the record, from 98 ER 98 through to 130. Those are the charts that show the extraordinary impact upon this, upon the industry and upon business travelers and travelers in general throughout the United States. Again, the Court below was very, took a very micro view of what substitutability is and what the cellophane case was all about. And in this case, the example used, similar to the one in another case, was that the Court said that the plaintiffs have not shown how, for example, a flight from San Francisco to Newark would compete with a flight from Seattle to Miami. And, of course, there's not a complete substitutability, but the Supreme Court has never analyzed it that way. Is there any substitutability between those two flights? Practically, I would say probably none, unless you're going to have a connection. But it would be the same as is there any substitutability between an anti-cancer pill and Alzheimer's. That's not the point that the Supreme Court is saying. The Supreme Court is saying is that look at the industry and what is the industry and is the industry impacted. And in each one of those, that's the way the Supreme Court analyzed it. There's no way the Supreme Court can analyze this kind of analysis because in each and every case, I could find, anyone could find, a microcosm where there would not be so-called substitutability. Let me just ask a question. Every expert, as far as I can determine in the field, whether it be academic, regulator, antitrust expert, defines the city-pair market as the appropriate market. Even if full interchangeability of use is not required, how does the national market contain even reasonable interchangeability of use such that it is the relevant market? Despite mileage plus and all those other kinds of things, nobody, I mean, virtually nobody, can you cite to me anybody who has said anything other than that the city-pair market is the relevant, appropriate market? Well, first of all, Your Honor, I mean, you can have submarkets. That could be a submarket. In addition, the GAO, which is also part of our record, and the Court can see that there are at least 12, I think it's 12 different markets which will result in a monopoly, 12 significant markets. And that's at our, that's, and that's prepared by the GAO. And it was before the Senate to be able to question the two executives. What page are you referring to? This is the excerpt of record. It's Exhibit, the excerpt of record, page 70, Exhibit No. 71. And I would direct the Court's attention to, it would be on page, Excerpt of Record No. 89, which would show the monopolies that are being created in these significant markets. And you could have a submarket for that as well. But on an overall basis, if you would look at the charts, you have two companies that are controlling 50 percent of the airline business in the United States. You know, I thought that's kind of what you were referring to. So these don't show monopolies. These show competitive routes. No, Your Honor. If you will look at Exhibit, if you will look at the Exhibit from GAO, these will result in monopoly markets from Houston to San Francisco, from Newark to San Francisco, from Denver to Newark, from Newark to Washington, D.C., from Dulles to Houston, from Cleveland to Denver, from Cleveland to Washington, D.C. And the other ones are just two or three other airlines of insignificant parts to them. But the point is, is that it's really, it's a national market because, remember what one of the defendants said. I said, how can you go from one market to another? We quoted him. This is the CEO from Continental. He said, it's real easy. I can get into any market I want to get into at 540 miles an hour. All I have to do, if I want to go to Cleveland, if I want to go, I think he said Charlotte. I just turned the nose of my 737 to Charlotte and I'm in Charlotte. He says it's very easy to go from one market to another. So you have to view the airlines in terms of, in my judgment, and what the Supreme Court has consistently done. These cases are not overruled. They may be old and they may be in the 60s and early 70s, but they have not been overruled. And when Judge Posner looked at it, he said it was a relatively simple rule. And the rule is, if you have a non-trivial transaction which eliminates a significant rival, that should be it for Section 7, especially in an area, especially in an industry which is concentrated. And if you would look at, we have a merger chart, and this is an excerpt of the Record 98, and you can see that the airlines have been wiped out and are on toward this unbelievable concentration in the industry. In the last four or five years or so, six years, the industry has been reduced in half. Yeah, that's because the LCCs are eating their lunch. Let me ask you the following question. What factual information in Professor Rubenfeld's report do you disagree with? I disagree with his analysis where he refuses to consider the national market, just completely refuses it. I didn't ask that question. What factual statements in Professor Rubenfeld's report do you disagree with? Well, as I said, I do not agree with the factual statements in his report because he refused to consider the national numbers. I questioned him. If you mean, is there? Let me be more precise, then. Yes. I'm looking at paragraph 100 of his report. The complaint, I don't know, this is on SCR 374, page 40 of his report, paragraph 100. The complaint recognizes that competition occurs between city pairs. Relevant competition, quote, relative competition exists between airports. For example, passengers traveling from San Francisco to Newark could consider airlines serving other airpoints at both endpoints, Oakland, San Jose instead of San Francisco, JFK and LaGuardia instead of Newark. And then he goes through, saying, you know, if we consider this not airport pairs but city pairs, which I gather is the standard way of analyzing this, of all of the markets where there's been a serious reduction because of the merger, if you look at city pairs, he says, excuse me, if you look at city pairs, their competition remains on all of these routes. Is that wrong? Well, I believe that if you're looking at it that way, I would not agree with that. Just as a factual matter, if you're looking at city pairs, are there routes on which there is no competition to the newly merged Continental and United? Well, the answer to that, I think, is answered by the chart that I showed, Your Honor. No. Those go directly to the city. That's airport pairs, I think. Well, I would again contest that, Your Honor. For example, if you're saying by city pairs that can you get to Houston? Yes, you can get to Dallas. Can you get to Dallas? Yes. But you have to go to Love Field. Where's Love Field? Well, it's not really an accessible airport anymore the way it used to be. It's the Dallas Fort Worth Airport. And that's true with almost every one of these airlines. And I'd like to just say, if I might, that when the court recognized just now the so-called LCCs, which are the so-called low-cost airlines, those are low-cost not to the people, but they operate low-cost and they just go from route to route. There's no network at all. By the way, they have just announced that they are merging. So now the two LCCs are merging. And USAir announced, as we, I think, supplemented the record, USAir has now announced that they are looking for a partner. Now, these Supreme Court cases are making a very large point about the trend toward concentration. And, again, they result in the same thing, higher prices, different availability, different capacities, reduction of capacities, and reduction of services, and different services. Everyone can see that. That's because of the lack of competition. Now, you had an expert in the district court. We did. And he prepared a report. He did. And you didn't put the report in the ERs. I don't know whether we put the report in the ER or not. I know you didn't because I can't find it. Okay. Well, I'm very sorry, but I don't know the answer to that. I'm sure we put his testimony in. He was the same person who testified in the Senate at the same time as the two chief executives. So if it was not included, I don't know the answer to that. His testimony is there. Oh, okay. By my quick summary of his testimony, he says, I basically agree with Professor Rubenfeld. Well, I don't know. I'm not sure. I don't know. I don't remember that. But what I do remember is that when the Supreme Court in its decision, for example, in Vons, simply said, these percentages don't mean anything. And now you're talking about grocery stores. They said the trend is toward concentration, and we're against that. That's what Section 7 is about. It is a very unique law. And so what will be the rule? What is the criteria? That you can microcosm any kind of merger and allow it to go? Or is it something that has to be, as the Supreme Court did in all these major cases, where they would look at, for instance, the burglar alarm against the fire alarm and said, well, of course, it's protection of the home. That's the way the market would be. Or Brown Shoe, it would be children's shoes, men's shoes, even though there's different kinds of children's shoes. And girls' shoes don't fit boys and so forth, because they're looking at the competition the way it is and the policy. The policy behind all of this is internal growth, not external growth, as the Supreme Court said in Brown Shoe. Internal growth creates jobs, creates innovation, and creates competition and lower prices. If you go outside, it's external. In merger, you do exactly the opposite, just like this case. First thing they did is they fire everybody down in Houston, 3,000 people. Boom, like that. They don't need them. That is the evil of the mergers that the policy is supposed to wreck. Now, the antitrust laws aren't full employment laws is the problem with that argument. In all due respect, Your Honor, the analysis was that by another judge, Judge Posner, that the view with regard to these Supreme Court decisions is in fact that. And he specifically mentions that fact, that the social and political importance of the antitrust laws have basically in the last 30 or 40 years been wiped out by reason of the Chicago view of what the policy should be, that it's just strictly economics. That is not what is said in Brown Shoe. In Brown Shoe, they're talking about the jobs of individuals, preserving jobs and independence, the more the merrier. That's what the Supreme Court was saying. Now, they haven't been overruled. And that's why when we get an opportunity, I see they only have one and a couple seconds, so I want to reserve at least something. But when we have an opportunity to refile or reallege or make an allegation, sure, we could probably say, okay, we're going to have an anti-merger suit from Oakland to San Jose. We could do that. But we're not supposed to do that because that is not the policy the Supreme Court has given us, and that policy has not been reversed. Thank you. Okay. You've saved a little time. Can I have a minute or two? We'll give you a minute or two. Okay. Thank you, Your Honor. Mr. Walsh? May it please the Court, my name is Stuart W. Gold. I apologize, I have a bit of a cold. And I represent the defendants, the airlines, in this matter. Could I ask you a question about your 28J letter that you submitted? Was this to show that the merger had been consummated? No. This is the order of the Department of Transportation? Yes. We submitted that only because the plaintiffs have made a big point of the earlier DOT order, which permitted the merger to consummate but required until the Department of Transportation had had more time to look at various factors, including safety factors, before they would permit the airlines to get a single operation certificate. The plaintiffs used the original order to say there's no problem here in joining this because they are under an obligation, the airlines, to hold themselves separate and not to move towards becoming one airline. And that's just not true under the old order that doesn't prevent integration. And indeed, the two airlines are well, they're seven months into integrating. Gates have been relocated, desks have been relocated. There's been a realignment of management down through, I think, the regional manager level. The integration is well underway. This new order removes sort of the last step. They no longer have to keep the corporate entities separate, and it's really just to allow them to go forward. I was just wondering if you were submitting that to show it was totally consummated. No. All right. It actually has been consummated. And one of the things about whether this appeal is moot or not is that the plaintiffs originally wanted to stop the consummation, basically the closing of the merger. That's why they ran in. We lost all last summer in terms of doing anything but doing discovery. We held a hearing, and then the PI was done right before the closing, so there would be a decision whether to rejoin it. It was not joined. Plaintiffs knew there was a problem. They ran into the court to try and get a whole separate order, which was very interesting since they argued to the court that the original Department of Transportation order required them to be held separate. I think they knew that that's not what was true, and they came in and tried to get a whole separate order, which was denied. The thing that they were trying to enjoin, the closing of the merger, that's over. And if there needs to ever be a remedy here, it's not to stop this merger, which is bringing already incredible benefits to consumers, but rather divestiture, if they can ever find a true relevant market and demonstrate the other requirements that there may be a substantial S&E of competition. And as the economists and regulators have approached this, if there ever is divestiture, it's not to separate the airlines. It's to divest gates or slots in order to cure that. Thank you. Now, whatever this Court would decide about a relevant market, one thing that was demonstrated by the record below is that in any relevant market, whether it's a national market, an airport pairs, city pairs, or even the business flyer market that was alleged, this is a market that is dynamic. It has entry. It has LCC competition that is intense. One of the things that Mr. Aliotto pointed the Court to was the chart that they have at the excerpts of record 98, which shows attempts to show that in this industry we're down to, after this merger, four airlines. And one of the things that we did at the closing argument was to take his chart, which had four airlines, and fill in all the LCCs and smaller airlines that had entered the market, including Virgin American, which entered in 2007. And there's a lot of competition. His own witnesses made a point of, I think it was Mrs. Robinson, who lives in somewhere like Palm Beach, or Palm Beach Gardens, and as soon as the LCCs were going out of Fort Lauderdale, she started to not use United and instead went to Fort Lauderdale to use the LCCs. Same thing with Mr. Mullaney, the plaintiff. In terms of competition, he explained how out of Grand Rapids, as soon as the LCCs came into that market, the Delta price to get him to where he wanted to go was almost halved. So whatever the market is, this is an industry that is characterized by intense competition, intense entry. One of the things Judge Fletcher asked about the expert for the plaintiff, they did not submit even his testimony. We put that in for the very reason that their expert agreed with Dr. Rubenfeld that he could not challenge any of his facts, and indeed, and in our brief, we quote, their expert almost had to be dragged to say something about the national market by Judge Seaberg. He didn't want to go there, and that's why it's not in his report, and that's why they didn't put the report in. When it comes to the relevant market, Judge Seaberg was very careful. He didn't reject the Supreme Court cases. He embraced them. He applied the standards that they asked. The only way to get to the plaintiff's market is to misrepresent what those cases say. As in their initial brief, the plaintiffs alleged that Brown Shoe found an all-footwear market. As we pointed out, that's just not true. They found the lines of commerce to be women's shoes, children's shoes, and men's shoes. Same thing, they say that we claim that general dynamics overruled all those earlier Supreme Court cases about what you look at when you're trying to find substantial lessening of competition, whether that's going to occur. In fact, we never said that general dynamics overrules it. In fact, it echoes the Continental Can case and the Brown Shoe case that says when you're looking at the relevant market, it's not just a mathematical exercise. You look at the structure, the history, what's going on there, and what's going on even in a national market is there is no chance of substantial lessening of competition. First, if there was such a market, the Herfindahls that the Department of Justice used to check on concentration, that actually comes out after the merger of United and Continental to just under $1,500, which means it's an unconcentrated market. So in the first instance, that demonstrates that if there was a national market, this is not a concentrated market. And indeed, when you look at the LCCs that have entered, you can tell that it's not an LCC. You keep holding that up. Is that in the record? It is not. It is not in the exhibit. It was in the closing argument that we showed it to the judge. Did you show it to him kind of like you're showing it to us? Oh, I'm sorry. No, it's all right. I'm teasing. I don't need to see it. No, I'm teasing. I don't need to see it. It's not in the record. It's not in the record. Okay, and if in fact there is such a market, there's also, as the record amply shows, been a great deal of entry by the LCCs, and there's no control after the merger to be predicted, and it hasn't been for a while, control over price or effect on price. The plaintiffs' expert didn't disagree with Dr. Rubenfeld, who demonstrated that, in fact, the history and the trend of pricing in this industry to the consumer has been downward, and it remained downward after the Delta-Northwest merger, which Mr. Aliota was involved with some of these plaintiffs challenging. So it's not a question of are they going to be able to control price or block entry. They can't. I just have a question. What is the relevance of the nationwide use of frequent flyer programs and corporate discounts and the like? Is that relevant to a question of whether there really is a national market? I don't think so, and there was no evidence offered that that evidence was actually offered to demonstrate that there is a separate market for business travelers. And as we demonstrated, the LCCs have, for a while now, had frequent flyer programs because the allegation is that attracts business customers, although I think consumers generally like that program, and that the LCCs have offered other things to try and successfully compete with business travelers, such as offering priority seating. Virgin American has a first class. So that evidence was trying to demonstrate that there is a separate market for business travel, which was rejected by Judge Seaborg. I'm sorry. Go ahead, please. I've been sitting here quiet listening to this, and I have a question. Isn't it true that the amount of competition is determined more by the availability of slots to land your airplane? You just can't take an airplane and aim it at Charlotte and be granted clearance to land. You need a slot. For example, going into LaGuardia, although the old rules required two minutes between heavy flights, isn't it true that they're now dropping them in at 69 seconds? Well, in fact, and the big problem is you can't get into LaGuardia. Your Honor, you're right. There are a certain number of airports. You can't get into Newark either. And the problem with Kennedy, JFK, if you try to land at JFK, you're, yeah, it's 3 o'clock in the morning, which is wonderful. So the only places open are White Plains, HPN. I'm from New York. I can't talk this Western stuff. Or out in the end of the island. So the problem is not competition in that sense. It's the availability of slots. And the more you merge, the more you attempt to make a hub out of a place, the more you have a shutdown. You have a monopoly on those slots. Isn't that true? Your Honor, it is true that there are certain airports, for instance, in New York and I think Chicago, that are slot constrained. Yeah. But if you look at the, I think the record demonstrates that for a consumer, they have the choices of going to Newark, Kennedy, or LaGuardia. Or Boise, Idaho. Well, I don't know. I mean, there's no problem with slots in Boise, Idaho. Correct, Your Honor. But there is already so many options at the New York Metropolitan Airport. Southwest just opened several slots and is operating several slots at Newark. JetBlue has an incredibly gorgeous and large terminal at Kennedy. Two large terminals. Two large terminals. Those airports, there is a lot of competition. And the way competition starts with LCCs, and it actually happened late last year, is you start with a part of the area where there is not slot constraints. And slots trade and do open up and are bought and sold. And so you might start where there are airports with slots open. But the record doesn't have anything in it. You and I can talk about this, but the record doesn't talk about it. Dr. Rubenfeld talked about concentrations at airports. He did. That's what I'd like to hear. That's where I want you to point me to. Give me a second, Your Honor. For instance, on 370 of the record, Dr. Rubenfeld addresses airport markets. And about the claim by plaintiffs that at certain airports and those markets there was a problem. Keeping in mind that, again, since we're now we have individual plaintiffs, they have to show the harm to them and what they are doing. Right. Okay. And so most of them do not come out of slot-constrained airports. But Dr. Rubenfeld spends two pages talking about the increase in airports, you know, the issue of increase in airport concentration, and, again, finds, A, that that's not a relevant market. That was not. The airports, even though it was in the complaint, they offered no evidence about it, and they did not posit an airport market or a slot market there. Three markets were the business traveler, the national market, and their version, the airport pairs. Although, as Your Honors indicated and correctly, everybody, economists, courts, everybody who's looked at this does not look at slots or they look at city pairs. Even the GAO report that Mr. Aliotto pointed to, they did a quick study, and they did look at, in fact, airport pairs. But they actually said on page 87 of the record that the preferable method, as they had done before, was to look at city pairs. Okay. I don't have much time. The other thing I would ask Your Honors to consider is you can affirm on this record on any ground that is in the record. So the public interest basis, which Judge Seaborg did not reach, I think is very important in considering whether or not you're actually going to, in essence, enjoin the continuation and conclusion of the integration of the two airlines. And I do believe, and that was one of the other things I sent with some authority, the court probably does not need to be reminded that that, in fact, is true, that you can affirm on a basis that Judge Fletcher did not reach in his decision. Unless there are other questions. Okay. Thank you. Mr. Aliota, would you like two minutes? I would, Your Honors. Thank you. First, I would like to say that the controversy with the experts and with the last maybe 30 years on these cases is the controversy with the experts. the so-called merger guidelines that is adopted by the DOJ and others and these experts, that's what they rely on, and the Supreme Court decisions. That's the conflict. And it's true, GAO did the initial analysis based on the merger guidelines. The experts in the case did it on the merger guidelines. The merger guidelines are not law. We don't know who wrote them. Probably someone in the bowels of the DOJ, somebody did it. But that is not the law. The Supreme Court has never. Yes, I know who wrote them, but I'm not going to tell you. Okay. Well, I know a couple of them, too, and they won't fess up to it. But the point is that the Supreme Court has never used the merger guidelines. And the merger guidelines are different, period. And they should not be the law. They shouldn't be the guide. The Supreme Court should be the guide. Okay, the continental can case, just as another example. Sardine can and cosmetics can, or jar, considered containers. That's the way they viewed it, even though you can't substitute one for the other. That's what the Supreme Court was looking at, what real competition was. Now, I know what the slots are in the different airports, Judge Duffy. But I would like to point out that it doesn't make any difference when these mergers. When America bought TWA, they shut down St. Louis. It used to be a hub going all over the world. And, Judge Nelson, when you mention about frequent flyer, frequent flyer are network airlines. Those are the big network airlines so that you could have a frequent flyer. You can go to Europe. That's why they go on them. That's why the LLCs don't get into that area. But I suppose if you wanted to have a merger. That's wrong. Southwest has quite an extensive frequent flyer program. Not foreign, Your Honor. Not foreign. Oh, I thought you were referring to foreign rather than the question of whether they have programs. Yes, I said they could go to any place in the world. They could go to, and they do. And that's why they go to the small places. I'd like to show you the chart. I'm going to show it. Okay, you're over so you've got, if you want to wrap it up. I've got 24 seconds. No, no, that means you're in the hole. But we won't require you to stop in the middle of the sentence. If you want to wrap it up, that would be good. I would like to just, if I could, if I could direct Judge Duffy to page 9 of our reply brief. If it has the testimony of the CEO who says he could go into any market that he wanted to. And if you're already an established airline, if you're an already established airline. And the last thing I would like to say is that contrary to what counsel said, harm is not required under Section 7. It's a significant threat of a harm. Thank you very much. Okay, thank you. The case of Mulaney v. UAL is submitted for decision. And that completes our oral argument calendar for the morning.
judges: Duffy, Nelson D. W., Fletcher W.